LOTTINGER, Judge.
The plaintiff in this suit as the widow of Alvie Leonard, seeks to recover in her own behalf and for the use and benefit of her minor child, Alvie L. Leonard, Jr., workmen’s compensation benefits at the rate of $30 per week for a period of 300 weeks together with medical expenses in the amount of $250 and burial and inci-dental expenses in the amount of $300. The petition recites that the decedent, who was employed by defendant as a pumper and dredge boat operator, died from a heart attack which was brought about by being compelled to work under conditions involving extreme heat and heavy physical condition. The answer sets up a general denial and the allegations that the decedent died as the result of an acute coronary thrombosis which was the result of natural causes and which was not in any manner connected with his employment.
The Lower Court ruled in favor of the defendant and the matter is before us on an appeal taken by the plaintiff.
The record shows that on Sunday May 27, 1956 the decedent was operating a floating dredge in the Amite river in the Parish of St. Helena. He arrived at the dredge about 9:30 or 10:00 o’clock in the morning and, with the assistance of one Basil Moore, started the engines and then commenced pumping operations by himself. While there is testimony in the record to the effect that it was very hot that day, there is also evidence to the effect that the sky was overcast and there were intermittent showers. A tarpaulin was suspended above the dredge operator. There is some dispute as to its then condition, some witnesses saying that it was in good condition and others saying that it was either burned or torn to the extent that it provided little, if any, protection from the sun’s rays. Be that as it may, it seems clear that the dredge upon which the decedent was working measured approximately 20 x 30 feet, that it was open on all sides and that upon it were situated two engines.
One of the motors was a 30 horsepower gasoline engine situated on the left side of the dredge and located about 8 or 10 feet away from the operator. This motor was equipped with a fan which, according to some of the witnesses, blew outward and away from the operator. The other engine, a 160 horsepower Diesel was situated some four or five feet from the rear *738 end of the dredge and,; apparently, some 20 feet from the operator. It was cooled by river water and operated at a temperature testified to as being less than 160°. The exhaust from this motor went upward and was discharged about 12 or 14 feet above the dredge deck. The air over the river was free to circulate across the dredge, around the motors and around the operator. From the facts as found, we are of the opinion that the deceased was not required to work in excessive heat.
The evidence indicates that the operator of this dredge could operate same from either a sitting or standing position by the manipulation of two levers. The gasoline engine described above provided the power for the levers and the Diesel motor provided the power for the pump. It appears that possibly two or three times a day the dredge boat itself may have had to be moved a little to change the position and this was done by slackening of the rope, anchoring the dredge on one side and tightening the rope fastened to the other side. However there is no evidence at all that on this particular morning the deceased found it necessary to move the dredge or to remove timber from the pump line. There were men within easy calling or hailing distance of the operator and would have been available had the deceased found it necessary to do any work beyond the ordinary operation of the dredge. He never called for help and there is no evidence in this record that it was necessary to move the dredge, or that same was moved, or to do anything else beyond the ordinary operation of the dredge, which in itself was not physically strenuous in character. It appears that after working some two hours or more the deceased stopped the operation, left the dredge, went to shore and asked to be taken to a doctor, complaining of indigestion from having eaten too many bananas. He was placed in a truck and taken to his home where he was examined by Dr. A. L. Lewis. According to the doctor, while he was in a state of shock that night, he found him to be reasonably comfortable the next day. His condition was satisfactory until the following Friday, June 1st, when he had a sudden attack, from which he died. The certificate of death signed by Dr. Lewis stated that the immediate cause of death was coronary thrombosis due to coronary heart disease with infarction.
Professor Malone in his work on Louisiana Workmen’s Compensation Law and Practice, Sec. 214 at page 267 comments on cases such as this as follows:
“In some of the cases it is stated that although the disabling event need not be different in kind or intensity from the regular work of the employee, yet it must appear that the employee’s regular work was physically strenuous in character or that he was regularly required to work in excessive heat. The reason for this apparent qualification is obvious: The fact that the event need not be unusual or unexpected does not obviate the fundamental requirement that the claimant must show a causal relationship between his disability and the conditions under which he performed his work. Where the regular duties are not of a sufficiently strenuous character to cause injury even to persons of weak constitutions, the courts properly insist on a showing of some special event which could account for the disability.
“The most recent illustration of this is in Waller v. Stone & Webster Engineering Corporation [La.App., 42 So. 2d 872]. Deceased was foreman in defendant’s warehouse, with three manual laborers working under him. His duties did not involve the performance of manual labor, although he occasionally assisted in moving heavy objects. On the day in question he had performed no heavy duties, and he appeared to be in good health and spirits. However, he was later found dead in his office chair as the result of a cerebral hemorrhage. Compensation was prop *739 erly denied, despite claimant’s insistence that it was not necessary to show the occurrence of any unusual event or exertion. The court appropriately observed:
“ ‘ * * * Before an accident can be established, it must be shown that there was a causal connection between the employment activity and the resulting injury or death, and the jurisprudence is to the effect unless some specific act resulting in injury or death can he shown, or unless it he shown that the nature of the work was sufficiently strenuous, or the nature of the work, plus the conditions tinder which it was done, to cause injury or death, then no causal connection could be deemed established. ’ ” (Italics ours.)
Dr. Lewis gave the following pertinent testimony:
“Q. Dr. Lewis, approximately when did you see Alvie Leonard on or about May 27, 19S6? A. It was in the late afternoon. I think four or five or six o’clock. It is not clear just which hour but late afternoon or early evening of the 27th of May Sunday afternoon.
“Q. What did you find was his trouble? A. I found him to be suffering with what looked like coronary heart attack.
“Q. There’s quite a bit of discussion here today — could you tell whether it was a coronary infarction or thrombosis or does it make any particular difference? A. I think he had had an infarction following a thrombosis-coronary artery.
“Q. Dr. Lewis, did you talk to him and determine when it struck him ? A. Yes, he gave me a history of it striking him on the way home from work Sunday evening — that same day.
“Q. Did he tell you he had to shut a boat down or anything, that he was operating by reason of that? A. No.
“Q. Dr. Lewis, it is in evidence that he was pumping on a boat operating a dredge without a helper. This dredge was pumping gravel in the Amite River and that he had to shut the boat down, and when he stepped off the dredge he had to sit on a log two or three minutes or four minutes and later he crawled a long across the river— A. Did what?
“Q. Crawled a long across the Amite River and sat down with his head propped in his hands and asked them to take him to a doctor that he felt like he was going to die or get him to a doctor before he died or words to that effect. Did he give you substantially that same history or was he able to talk very much? A. He was able to talk but. I have no recollection of that history at all. He told me he got sick coming home in the car is the way I understood it.
“Q. Well, he was on a boat and according to the testimony it had to be shut down and he was sent home for medical attention. Now, is that consistent with your findings ? When you saw him did it appear that that was when he first sustained this coronary infarction? A. I had to have his word for it, he said he took sick coming home in the car. That’s all I had. He was an acutely sick man when I saw him.
“Q. Now, acutely — that disabled? A. Acutely sick means that he was suffering severely at the time, you understand, in severe pain and distress.
“Q. Now, was that a — acute attack that means suddenly and unforeseen and unexpected ? A. Well, those kind of attacks usually come suddenly.
“Q. From the history that he gave you would you say that was suddenly and unforeseen? A. All I had to go by was what he told me — was he said he got sick coming home, took that pain *740 in his chest coming home and far as I know there was no history of any illness before that.”
“Q. If we assume that Mr. Leonard carried on his usual job for some two or two and a half or possibly three hours on Sunday morning, May 27, would it be your opinion that that work caused the thrombosis of the afternoon?- A. At his usual occupation?
“Q. At his usual work, that’s right. A. No, I could not say that it would, no.”
The trial judge rendered written reasons for judgment wherein, relying to a great extent on the testimony of Dr. Lewis, he concluded that the decedent’s attack occurred in the truck on the way home and had no connection with any trauma or exertion which occurred at the dredge: We cannot say that he erred in so holding. Assuming that it was established as a fact that the decedent’s duties were strenuous and performed under conditions of extreme heat (which we do not find here) we still do not believe that the burden of proving the causal connection between his work and the attack has been discharged. The plaintiff produced an expert who gave some interesting testimony regarding the effect of heat upon the heart, but his testimony falls far short of establishing the required proof.
The plaintiff in a workmen’s compensation case, as in any other case, bears the burden of proof and is required to establish his or her claim to a legal certainty by a reasonable preponderance of the evidence, and that establishment of a claim to the extent only of possibility or even of probability is not sufficient.
This case is somewhat similar to the case of Kraemer v. Jahncke Services, Inc., La.App., 83 So.2d 916. Under the circumstances of this case, to hold that the heart attack was due to the aggravation of his work would in effect make the employer an insurer of the life of the deceased, which the Compensation Law never intended however liberally it is supposed to be construed in favor of the employee.
For the reasons assigned, the judgment appealed from is affirmed.
Judgment affirmed.